In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2443

ROBERT LEONARD,

*Plaintiff-Appellant,*

*v.*

EASTERN ILLINOIS UNIVERSITY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 07 C 2172—**Michael P. McCuskey**, *Chief Judge.*

SUBMITTED FEBRUARY 8, 2010—DECIDED MAY 26, 2010

Before BAUER, EVANS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Robert Leonard, a Native American, worked at Eastern Illinois University ("EIU") for nearly twenty years, during which time EIU passed him over for several promotions. Believing that the most recent denied promotion was motivated by anti-Native American bias, Leonard sued EIU under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-1 - 2000e-17. The district court granted summary judgment in favor

of EIU, and in Leonard's appeal, we consider de novo whether the following evidence, construed in Leonard's favor, creates a triable issue on his Title VII claim. *See Turner v. The Saloon, Ltd.*, 595 F.3d 679, 683 (7th Cir. 2010).

Leonard is a Native American through the family history of his father, who was a member of the Saginaw Band of the Ojibway Nation. While at EIU, Leonard worked as a "building services worker," a janitorial and mechanical support position, but his time on campus was more than a job for a paycheck. Leonard was an outspoken advocate on Native American issues, and he frequently complained to the EIU student newspaper about Native-American-related articles or advertisements that he found offensive.

Leonard was a particular critic of "Chief Illiniwek," the image formerly used by the University of Illinois at Urbana-Champaign ("U of I") to represent University athletics. Leonard was not alone in opposing the Chief, which had generated controversy for decades. *See, e.g.*, Jodi S. Cohen, *Hail to the Chief—and Farewell,* Chi. Trib., Feb. 22, 2007, at 1; Tracy Dodds, *Illinois Fans Still Divided Over Use of Mascot,* Indianapolis Star, Sept. 4, 2005, at C1. But Leonard's opposition even led to a nationally publicized lawsuit. Sometime around 2005, Leonard sued the "Honor the Chief Society" for denying him entry to the showing of a pro-Chief movie, allegedly based on his Native American status. Leonard's involvement in the lawsuit, which ultimately settled out of court, received CNN news coverage.

As mentioned, in between his civil rights activities, Leonard had a regular job at EIU as a building services

worker. Over the years, Leonard participated in several interviews (four or five, he didn't recall exactly) for promotion to the more supervisory "building services subforeman," but none led to a promotion. One of the more recent interviews, on March 24, 2005, triggered the dispute that is the basis of this lawsuit.

Leonard interviewed before a panel of six EIU supervisors: Herb McElwee, Travis Magee, Valerie Leonard (no relation), Kevin Larkin, Steven Gilbert, and John Sigler. Although the appellant had worked with all of these people before, the interview started out tensely for him when McElwee and Magee removed their jackets to reveal shirts with the Chief Illiniwek logo.

McElwee's and Magee's choice to wear Chief shirts that day might have been unremarkable given the "March Madness" context. During the 2005 college basketball season, the U of I men's team was making a strong showing in the NCAA tournament. In fact, on the very March 24 date of Leonard's interview, the Fighting Illini were scheduled to play (and ultimately won) a Sweet Sixteen match against the University of Wisconsin— Milwaukee. This Illini basketball hype provides one possible, innocuous explanation for McElwee's and Magee's Chief shirts. As Leonard acknowledged during his deposition, the EIU campus was home to many Illini fans, who frequently wore Chief apparel during the 2005 season.

Still, March Madness aside, Leonard thought that McElwee and Magee wore their Chief shirts as a statement against Leonard's opposition to Chief Illiniwek. He

was offended by the shirts and felt that his anger came across during the interview, negatively affecting his performance. As it turned out, Leonard didn't get the promotion after his March 2005 interview, but notably, no one else was promoted to building services subforeman at that time. The record does not reveal how many other candidates, if any, participated in the March 2005 interviews, how Leonard performed compared to those candidates, or why no one was promoted.

Shortly after his interview, in April 2005, Leonard made a complaint to EIU's Office of Civil Rights about McElwee's and Magee's Chief shirts. After hearing Leonard's complaint, a representative from the civil rights office told McElwee and Magee not to wear Chief apparel when dealing with Leonard, and Leonard said that he was satisfied with this outcome.

Several months later, in October 2005, Leonard interviewed again for the building services subforeman job along with seven other candidates. The interview panel consisted of the same six supervisors, none of whom wore anything Illini-related or otherwise offensive to Leonard. Leonard thought that he interviewed well, but unfortunately, he didn't do well enough to get the promotion. Based on the numerical scoring system used by the panel, Leonard ranked seventh out of the eight candidates. Only the candidates with the top three scores were promoted.

Leonard sued EIU under Title VII, claiming that the interview panel's decision not to promote him was retaliation for his April 2005 civil rights complaint about

the Chief Illiniwek shirts. The district court granted summary judgment in favor of EIU, concluding that Leonard had no evidence linking the denied promotion to the civil rights complaint. Leonard appeals.

The controversy surrounding the use of Chief Illiniwek to symbolize U of I athletics is not new to this court. In *Crue v. Aiken*, 370 F.3d 668, 678-80 (7th Cir. 2004), we addressed the tension between students' First Amendment right to protest the Chief and the smooth operation of the University's athletic programs. (While the free speech issues in *Crue* were important, the *Crue* opinion's lasting contribution may be its scholarly discussion of great college nicknames, including the all-time favorite "Banana Slug" of the University of California—Santa Cruz. *Id.* at 671-72.) Fortunately, this case does not require us to delve into the Chief controversy, which is relevant only insofar as it relates to the April 2005 civil rights complaint underlying Leonard's Title VII retaliation claim.

Title VII prohibits an employer from retaliating against an employee for conduct that is protected under the Act. *See* 42 U.S.C. § 2000e-3(a). A plaintiff may make out a Title VII retaliation claim using either the direct or indirect method of proof, although the distinction between the two methods "is often fleeting." *Turner*, 595 F.3d at 688 (quoting *Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 452 (7th Cir. 2009)). The direct method requires "evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Id.* at 687

(citation omitted). The indirect method also requires evidence of the first two elements, "but instead of proving a direct causal link, the plaintiff must show that he was performing his job satisfactorily and that he was treated less favorably than a similarly situated employee who did not complain of discrimination." *Stephens v. Erickson*, 569 F.3d 779, 786-87 (7th Cir. 2009) (citation omitted).

Leonard argues that he has shown a triable issue under the direct method of proof, and EIU responds that Leonard's case fails on each of the three direct-method elements. We need only focus on the third element, whether Leonard can establish a causal connection between his civil rights complaint and EIU's failure to promote him.

From our review of the record, Leonard simply lacks any evidence linking his April 2005 Chief-related complaint to his denied promotion. Leonard has presented no evidence that any of his interviewers, or anyone else at EIU, was angered by the complaint. On the contrary, although Leonard testified that he didn't have "great respect" for EIU's civil rights office, he acknowledged that EIU encouraged its employees to bring forth complaints of discrimination whenever they felt necessary.

The scoring results for Leonard's October 2005 interview also contain no hint of unlawful discrimination. Under the interview process, the interview panel asked each candidate a series of standardized, pre-written questions. Each interviewer then gave the candidate a score of 1 to 5 points in each of five job-related categories, for a possible total score of 5 to 25 from each interviewer

and, with six interviewers, a possible combined total score of 30 to 150. The interviewers were all consistent in scoring Leonard among the bottom 50% of the candidates. Leonard's resulting combined total score of 109 placed him only seventh out of the eight candidates, far from the top three who earned a promotion.

Given the standardized interview format and the consistency of the interviewers' scoring, Leonard cannot show that any interviewer(s) denied him a promotion in retaliation for his civil rights complaint. *See id.* at 788 (describing a similar interview process with standardized questions and numerical scoring as "reasonable and fair"). Notably, McElwee and Magee, the Chief shirt wearers most likely to be upset over Leonard's complaint, gave Leonard scores that were within the mainstream. McElwee's and Magee's total scores for Leonard were 19 and 18, respectively, which were actually higher than the 17 given by Larkin and the 16 given by Sigler. True, McElwee and Magee gave Leonard the lowest score of any candidate, but so did Valerie Leonard and Gilbert. This consistent scoring pattern by the interviewer panel suggests only that Leonard was outperformed by other candidates, not that he was the target of retaliation.

Leonard argues that "suspicious timing" between his civil rights complaint and his denied promotion implies a causal relationship, but we are unpersuaded. The six-month lag between Leonard's April 2005 complaint to the civil rights office and his October 2005 unsuccessful interview is too long to infer a link between the two. *See Turner*, 595 F.3d at 687 (finding no connection

between a firing and the employee's complaints of sexual harassment more than a half year earlier); *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (2008) (same where time interval was seven weeks); *cf. Spiegla v. Hull*, 371 F.3d 928, 943 (7th Cir. 2004) (inferring causation where an unfavorable job transfer occurred just four days after the employee's protected speech).

The timing issue might be closer if we considered the period immediately after Leonard's March 2005 interview, rather than after his October 2005 interview, as the time when the denied promotion took place. If the interview panel's decision not to promote Leonard based on his March interview came shortly after Leonard's Chief-related complaint against McElwee and Magee, this close temporal connection could bolster a circumstantial case of retaliation. Unfortunately for Leonard, his evidence does not establish such a close sequence of events. The record shows that Leonard interviewed on March 24, 2005, and then made his civil rights complaint sometime in April 2005, but Leonard offered no evidence on when the panel made its decision in relation to these two events. Very conceivably, the decision not to promote Leonard after his March interview came well before he made his April civil rights complaint, in which case Leonard's claim of suspicious timing unquestionably fails. For a suspicious-timing retaliation theory, the order of events is even more important than the time between them; the theory doesn't work if the retaliatory act *precedes* the protected activity.

Even assuming that the decision not to promote Leonard came "on the heels" of his April 2005 civil rights

complaint, *Spiegla*, 371 F.3d at 943, Leonard still could not avoid summary judgment because "suspicious timing alone is insufficient" to support a Title VII retaliation claim. *Turner*, 595 F.3d at 687 (quotation omitted). The timing issue is even less significant in this case given the fact that, during his career at EIU, Leonard had several unsuccessful interviews for a promotion. Since Leonard repeatedly failed to get a promotion in prior years, EIU's decision not to promote him in 2005 was not "suspicious." *Cf. Spiegla*, 371 F.3d at 943 (noting that the adverse job transfer occurred after seven years of uninterrupted postings on the plaintiff's preferred job).

In a last effort to avoid summary judgment, Leonard points to comments by two of his interviewers, Larkin and Gilbert, that purportedly show an anti-Native American bias. We may easily dismiss these as "stray remarks" that do not show that either Larkin or Gilbert used the interview process to retaliate against Leonard's civil rights complaint. *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 721 (7th Cir. 2008).

The Larkin comment came in 1994 or 1995, after Leonard had filed a complaint with the civil rights office about EIU students making Chief-related statements towards him. Following that complaint, Larkin allegedly told Leonard "that if I [Leonard] cut my hair and act like others, I wouldn't have as many problems as I did." Assuming that Larkin's comment could suggest some level of anti-Native American bias, it is far too remote from the 2005 denied promotion to help Leonard's case. To support an inference of retaliation, a discriminatory

comment must be related in both time and subject matter to the adverse employment action. *See id.* Larkin's comment was neither, as it came a decade before Leonard's 2005 interview and had nothing to do with his prospects for promotion. *See id.* (dismissing an offhand, sexist comment that occurred more than a year before the employee's firing).

The Gilbert comment identified by Leonard is equally remote. Sometime during the 1990s, Leonard confronted the Illinois governor during a town hall meeting, complaining that the governor had not responded to Leonard's multiple applications to meet and discuss Native American issues. In connection with this complaint to the governor, Gilbert allegedly commented that Leonard "didn't know his place." Whatever Gilbert meant by this ambiguous comment, it was entirely unrelated to the decision several years later not to promote Leonard to a building services subforeman.

In sum, Leonard lacks evidence that EIU officials refused to promote him in retaliation for his April 2005 civil rights complaint, or for that matter any reason other than his relatively poor interview performance. We AFFIRM the district court's grant of summary judgment in favor of EIU.