In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-1496

CHRISTINE LEITGEN,

*Plaintiff-Appellant,*

*v.*

FRANCISCAN SKEMP HEALTHCARE, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 08-cv-038-bbc—**Barbara B. Crabb**, *Judge.*

ARGUED SEPTEMBER 17, 2009—DECIDED JANUARY 13, 2011

Before ROVNER, SYKES, and TINDER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Dr. Christine Leitgen sued her former employer, Franciscan Skemp Healthcare ("the Hospital"), under Title VII of the Civil Rights Act of 1964, claiming as relevant here that it retaliated against her by forcing her to resign after she complained that its compensation scheme unlawfully underpaid physicians based on gender. The Hospital pools revenue received for childbirth deliveries and redistrib-

utes the receipts equally among all physicians in the obstetrics department, but Leitgen advocated for a system that would pay physicians on a per-delivery basis. The district court granted summary judgment for the Hospital. We affirm.

## I.

Leitgen began working as a physician in the Hospital's Department of Obstetrics and Gynecology in 1993. The number of doctors in the group fluctuated with time, but when Leitgen joined she became the fourth physician and second woman in the group. Over the years Leitgen developed her practice and became one of the department's most in-demand and highest paid doctors, frequently performing more than 100 deliveries per year. In January 1999, the department appointed her to serve as chairperson, and in 2002 it reappointed her to a second term. Leitgen stepped down before her second term expired, however, to dedicate more time to her clinical practice, and after about a year of interim leadership, the Hospital eventually hired Dr. Edward Sandy in August 2004 to serve as the department's new chair.

## A.

Throughout Leitgen's employment, the Hospital billed pregnant women for a package of services that included both prenatal care and delivery. And although the Hospital compensated the patient's primary physician directly for providing prenatal services, it pooled the

revenue generated from the delivery and redistributed it equally among the physicians in the group. Because of this policy of sharing delivery revenue, the doctors who performed the most deliveries—regardless of gender—received less payment than they would under a system where each doctor was paid purely for services rendered.

At several points during Leitgen's employment, she and other female physicians expressed concern that, because each woman in the practice had a larger patient base and thus tended to perform more deliveries than each man, the Hospital's policy of pooling delivery revenue meant that the women were unfairly compensated for their birthing services. Between 1993 and 1999, even though her salary was one of the highest in her group, Leitgen complained numerous times about the pay structure to the then-chair of the department. At one point the chair raised the issue with the Hospital's compensation committee and learned that any change would have to be made within the department. No change was made after these initial inquiries.

The female physicians again raised the issue during Leitgen's tenure as chair. At that point it remained unclear whether a change required a unanimous vote of the department, but regardless, Leitgen did not try to modify the system because the female doctors in the group feared that a change would adversely affect the department's morale. In 2003, one of the department's other female physicians, Dr. Karen Keil, complained again to Leitgen about the compensation setup, pointing out

that because she and Leitgen currently performed more deliveries than anyone else in the group, the system was most detrimental to them. When Sandy became the department chair, both Keil and Leitgen informed him that they thought the compensation system was unfair to them, both as women and as high-volume physicians. (The parties dispute whether Leitgen and Keil framed their problem with the compensation system as implicating possible gender discrimination, but for purposes of summary judgment we resolve that dispute in Leitgen's favor.)

In light of these complaints, the department's physicians discussed compensation schemes several times. When Sandy became chair, he put the issue on the agenda for multiple department meetings and distributed scholarly work outlining different potential models of compensation. Sandy also expressed a concern that paying doctors based purely on their number of deliveries would tempt them to schedule medically unnecessary inductions so that patients would give birth during a particular shift. At no point during any of these discussions did Leitgen or any other doctor ask for a vote on the issue, and the shared-revenue arrangement remained in place.

When Leitgen's intra-departmental complaints proved unproductive, she took her concerns directly to Tom Tiggelaar, who was the secretary of the Hospital's compensation committee, the Hospital's vice president of finance, and the chief financial officer. On August 14, 2006, Leitgen emailed Tiggelaar requesting a meeting, and

Tiggelaar responded by speaking to Sandy about the issue and by reaching out to other employees to request statistics regarding Leitgen's production as compared to other members of the department. After receiving delivery statistics, Tiggelaar met with Leitgen on September 5, 2006, to discuss the matter. Leitgen complained that the compensation system adversely affected her pay and that she thought the pooling and sharing of delivery revenues was discriminatory to women. (The Hospital disputes that gender-based discrimination was part of this conversation, but again, we assume for purposes of summary judgment that Leitgen communicated the potential discriminatory import of her concerns.) After the brief meeting, neither party followed through on promises to resume their conversation. But, according to Tiggelaar, he reported "the essence" of the meeting to both Sandy and Diane Holmay (one of Leitgen's supervisors) within a day or two. Leitgen herself also informed Sandy that the meeting had taken place. According to Leitgen, Sandy was annoyed that she had taken her concerns outside of the department, and their relationship suddenly soured after her meeting with Tiggelaar.

## B.

Although Leitgen generated substantial revenue on behalf of the Hospital, her time with the OB/GYN department was marred by conflicts with patients and staff. Leitgen takes issue with the way other staff members perceived her behavior during these conflicts, but she

acknowledges that patients and nurses complained about her communication style. Even though we construe the facts in Leitgen's favor, we need not ignore the undisputed fact that these unflattering complaints were made by patients and staff. For example, in 2001 a nurse complained that Leitgen chastised her about her performance and stated that it was "typical of the poor nursing care" in the department. The following year, a patient experiencing an ectopic pregnancy reported that Leitgen refused to treat her. Later in 2002, a different nurse confronted Leitgen, telling her that members of the support staff found her demeanor condescending. In 2003, Leitgen met with members of the Hospital's management to discuss her combative communication with other employees, and after that meeting one of the managers recommended to Holmay that Leitgen be fired because of her communication problems. But the Hospital did not fire Leitgen at that time, and the following year she and Holmay met with the same manager again to discuss similar issues of teamwork and collaboration. During that meeting Holmay confronted Leitgen about new incidents involving conduct that Holmay considered disruptive to patient safety and staff camaraderie.

Even after these conversations with management about respectful communication, nurses continued to take issue with Leitgen's behavior, and they reported their concerns to Bonnie Young, the director of the department's nursing staff. Here again, Leitgen disputes the way her behavior was perceived by the staff involved, but admits that she received multiple oral warnings between 2004 and 2006 that her communication with the

support staff was problematic. For example, Leitgen acknowledges that at least two nurses told Young that they refused to continue working in the department because of the way Leitgen had treated them.

Despite these continued communication problems, in her performance evaluation in March 2006, both Sandy and Holmay identified positive contributions that Leitgen made to the department. They told Leitgen that she had shown some improvement in her interactions with support staff and was an asset to the Hospital. Sandy also asked Leitgen to serve on the recruiting committee, and he invited her to represent the department at a conference at the end of the year. As of March 2006, both Holmay and Sandy agreed that Leitgen faced no risk of termination.

But four months after this performance evaluation, nurses began to renew their complaints about Leitgen. In July 2006, Young reported to Sandy that another nurse, Wendy Stone, had complained that Leitgen had humiliated and verbally abused her in front of a patient. (Leitgen admits to having made comments that upset Stone in front of a patient but contends that the comments were justified by Stone's performance.) The same day that Sandy learned of the incident he wrote the first of a number of emails to Holmay about the possibility of disciplining Leitgen. In this email, Sandy said that he had tolerated Leitgen because she added value to the department, but he also commented that her behavior could not "go on forever." After meeting with Stone to discuss the incident, Sandy sent another email to Holmay

stating that they needed to meet in person because, upon reflection, he believed that Leitgen's interpersonal conflicts were more serious than he had previously understood. Both Stone's complaint and Sandy's decision to explore discipline against Leitgen occurred more than a month before Leitgen met with Tiggelaar in early September 2006 to complain about the compensation system.

Leitgen's deteriorating relationship with nursing staff and patients continued throughout September. For example, while Leitgen was in the middle of a delivery, a nurse called asking for assistance with a non-urgent matter. Leitgen could not take the call herself, but she told the person relaying the message to "go hit" the nurse who had requested assistance. Leitgen later testified that she had meant this comment facetiously, but she admitted that some people in the room apparently did not take it as a joke. That same month a patient complained that Leitgen had blamed her for the difficulties that had arisen during her emergency Caesarean section. And around the same time, Young received two additional complaints from staff members about Leitgen: a nurse complained that she had been belittled, and a midwife reported that she was unable to build a collaborative practice with Leitgen. Young did not notify Leitgen about either of these incidents or complaints.

During September (the exact date is uncertain), while she was still serving on the recruiting committee, Leitgen also made comments that members of the Hospital viewed as disloyal to its recruiting mission. Leitgen told

a doctor that the department was recruiting that she felt her ideas were not heard, that she had little respect for the nursing staff, and that she felt unhappy at the Hospital. In the course of that conversation, Leitgen told the recruit that she would not have joined the Hospital "knowing what she knows now" and that she might be gone by the time he arrived. After this conversation with Leitgen, the recruit contacted Sandy and expressed a concern about accepting a position with the Hospital because he feared that the physicians were unhappy.

## C.

By early September 2006, having decided the previous month to discipline Leitgen for her abuse of staff, Sandy and Holmay began preparing a recommendation that Leitgen be terminated. They met with a member of the management committee to determine what documents they would need, and shortly after this meeting, Holmay asked Young to prepare a timeline listing instances where nurses or patients had reported that Leitgen was either rude or disruptive. Young prepared a first draft of this timeline by September 8, 2006, based on unofficial, private notes that she kept regarding conflicts between staff members. Although Young memorialized complaints from nurses regarding interactions with doctors and other staff in these notes, she did not, as a general rule, investigate the incidents or take note of opposing viewpoints. Holmay and Sandy had been exchanging emails about disciplining Leitgen since at least July 2006, but before September 2006 no one had been

gathering documentation about Leitgen "for the pur-
poses of termination." In addition to requesting
the timeline, Sandy began excluding Leitgen from con-
versations about recruiting and told her that she would
no longer be representing the Hospital at the upcoming
conference. Sandy did not inform Leitgen that she was
in jeopardy of being fired.

On October 31, 2006, Sandy formally recommended to
the Hospital's executive committee that it terminate
Leitgen. He supported his recommendation with the
following documentation: personal letters from both
him and Holmay, Young's timeline, and a separate
timeline created by Holmay. Through these documents
and their personal statements to the committee, both
Sandy and Holmay expressed their opinion that, although
Leitgen was an amply qualified physician, her hostility
toward staff and patients was unacceptable. In addition
to these concerns, one of the members of the executive
committee emphasized that he was dissatisfied by the
negative comments Leitgen had made recently to the
physician the Hospital had been trying to recruit. After
hearing recommendations from Sandy and Holmay, the
committee voted to fire Leitgen.

On November 14, 2006, Leitgen attended a "termination
session" where members of the executive committee
told her that she could either resign or be fired. Leitgen
quit the following day. Holmay attended the meeting
with two other hospital administrators, but Sandy was
absent. At the meeting, the Hospital told Leitgen that
it was terminating her because of the numerous com-

plaints that nurses and patients had made against her over the years. In discharging Leitgen, the Hospital elected not to follow its policy recommending that it notify employees in writing of potential disciplinary actions resulting from disruptive behavior.

The district court granted summary judgment for the Hospital. It bypassed the question whether Leitgen's complaints regarding the compensation system were protected conduct and concluded that, even if they qualified, no reasonable jury could find a causal connection between Leitgen's complaints and her forced resignation. The court found it significant that Leitgen had been complaining about the compensation system for years, but the Hospital did not force her to resign until after a flurry of complaints from nurses regarding her conduct.

## II.

On appeal, Leitgen relies exclusively on the direct method of proof to argue that genuine issues of material fact prevent summary judgment for the Hospital. To survive summary judgment on her retaliation claim under the direct method, Leitgen needed to provide sufficient direct or circumstantial evidence to establish (1) that she engaged in protected conduct, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between the two. *See Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir. 2010); *Casna v. City of Loves Park*, 574 F.3d 420, 426 (7th Cir. 2009). There is no dispute that Leitgen's forced resignation constitutes an adverse employment action, so we are left with the

questions whether Leitgen engaged in protected conduct and whether that conduct was causally connected to her forced resignation. The district court bypassed the issue of protected conduct, but because Leitgen focuses on her conversation with Tiggelaar as the applicable protected conduct and that conversation is relevant to the question of causation, we begin our analysis there.

**A.**

For Leitgen to show that she engaged in protected conduct, she had to prove that she had a reasonable, good-faith belief that the compensation system was discriminatory when she complained about it, but she need not prove that the system was actually discriminatory such that she would have prevailed on a claim of intentional discrimination under Title VII. *See Tate v. Exec. Mgmt. Servs., Inc.*, 546 F.3d 528, 532 (7th Cir. 2008); *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 752 (7th Cir. 2002). Our requirement that Leitgen have a reasonable, good-faith belief that her complaint involved gender discrimination is not onerous. *See Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 892 (7th Cir. 2004). She simply had to show that her belief that she was complaining about unlawful discrimination was not "'completely groundless.'" *See Fine*, 305 F.3d at 752 (quoting *McDonnell v. Cisneros*, 84 F.3d 256, 259 (7th Cir. 1996)).

In her appellate brief, Leitgen acknowledges the Hospital's argument that she never engaged in protected conduct but responds that the Supreme Court's decision in *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*,

129 S. Ct. 846 (2009), establishes that her complaints were protected. *Crawford* addressed only whether cooperating with an employer's internal investigation of discrimination was protected conduct, *id.* at 850-51, and is not dispositive here. Instead, the question here is whether Leitgen reasonably believed that her complaints about the compensation system amounted to more than a gender-neutral accusation that the system unfairly penalized her as a high-volume physician and instead charged gender discrimination.

Title VII, of course, prohibits discriminatory compensation based on gender, *see* 42 U.S.C. § 2000e-2(a)(1); *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 656 (7th Cir. 2010). The Hospital recognizes that a disparity in pay based on gender would violate Title VII, but argues that Leitgen lacked an objectively reasonable belief that the Hospital's pay system intentionally discriminated against women. The Hospital supports its position by pointing out that the compensation system had remained the same throughout Leitgen's employment, that Leitgen did not try to change the system during her tenure as department chair, and that the Hospital justified the pay scheme with the nondiscriminatory interest in discouraging elective inductions. But these reasons do not undermine the sincerity or reasonableness of Leitgen's complaint that she believed the Hospital's pay scheme to be discriminatory based on gender. Throughout her opposition to summary judgment, Leitgen has repeatedly pointed to evidence that she has always framed her complaints as a potential issue of gender discrimination. Moreover, the ongoing

nature of her complaints during her tenure, and her tolerance of the system while she was chair, do not conclusively show that her complaints about the pay system were unreasonable or insincere. Instead, these facts suggest that the impediments to changing the compensation system at the Hospital were significant and enduring. Thus, we credit Leitgen's contention for purposes of summary judgment that her conversation with Tiggelaar was protected conduct. We note, however, that Leitgen's focus on her conversation with Tiggelaar as the particular instance of protected conduct that caused her termination is relevant to the issue of causal connection.

**B.**

Leitgen next argues that she presented sufficient evidence that the Hospital's decision to fire her was motivated by her complaints about the compensation system, particularly her conversation with Tiggelaar. To establish a causal connection between her allegedly protected conduct and her forced resignation, Leitgen had to show that her complaints were "a substantial or motivating factor" in the Hospital's decision to fire her. *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008) (citation and quotation omitted). Leitgen points to circumstantial evidence that, in her view, shows that the Hospital based its decision, at least in part, on her complaints about the compensation system. We address her evidence and, like the district court, conclude that the inferences Leitgen attempts to draw from it are too at-

tenuated to survive summary judgment when considered individually or together.

Leitgen relies most heavily on the temporal proximity between her conversation with Tiggelaar and her forced resignation. As we have often observed, suspicious timing alone is almost always insufficient to survive summary judgment. *Leonard v. E. Ill. Univ.*, 606 F.3d 428, 432-33 (7th Cir. 2010); *Turner v. Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cir. 2010). Leitgen nonetheless contends that this case is the exception because Sandy and Holmay began preparing for her termination just days after her meeting with Tiggelaar. *See Casna*, 574 F.3d at 427 (finding that suspicious timing created triable issue where employee was terminated one day after protected conduct); *Spiegla v. Hull*, 371 F.3d 928, 943 (7th Cir. 2004) (four days later); *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796-97 (7th Cir. 1997) (two or three days later). After reviewing the evidence, we find that Leitgen cannot overcome the general rule that suspicious timing alone is insufficient to support a claim of retaliation.

First, Leitgen's conversation with Tiggelaar was not the first time that she complained about the compensation system. To the contrary, she first pursued this issue with the department *years* before the Hospital fired her. When an employee's protected conduct is separated by a significant period of time from the adverse employment action, the proximity of the incidents does not support a causal connection between them. *See Leonard*, 606 F.3d at 432 (finding adverse employment action six months after protected conduct insufficient to establish

retaliation claim); *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (seven weeks between events).

Leitgen responds that her complaints were ongoing up until September 2006, and therefore a large time gap does not separate her protected conduct from her discharge. But this response misses the point. Because she had been complaining to hospital executives about the pay system for years, she must offer a valid reason why her conversation with Tiggelaar would suddenly trigger retaliation. She proposes one reason: It was the first time she raised her concern to anyone outside the department. But this assertion is incorrect. Leitgen testified that, with the help of the then-chair of the department, she raised these concerns with the compensation committee (who are people *outside* the department) sometime before she herself became chair in 1999. Even though these extra-departmental complaints occurred before Sandy came to the Hospital, Leitgen admitted that both Sandy and Holmay—the executives who recommended her termination—knew of her concerns about the compensation system years before the Hospital forced her to resign. A claim of retaliation based on suspicious timing depends on what the relevant decision-makers knew and when, *see Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 925 (7th Cir. 2007); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668 (7th Cir. 2006), and here the evidence shows that the relevant decision-makers knew of Leitgen's belief that the compensation system was discriminatory long before they decided to terminate her.

Leitgen's reliance on her conversation with Tiggelaar as the protected conduct that caused her termination is

also flawed because Sandy and Holmay had begun discussing ways to discipline Leitgen *before* that meeting ever took place. Sandy and Holmay exchanged emails about how best to discipline Leitgen after she belittled Nurse Stone in front of a patient in July 2006, weeks before Leitgen wrote to Tiggelaar to request a meeting and more than a month before that meeting occurred. When a retaliation claim is based on suspicious timing, "the order of events is even more important than the time between them; the theory doesn't work if the retaliatory act precedes the protected activity." *Leonard*, 606 F.3d at 432. Here, although Leitgen asserts that there is a dispute of fact, the evidence is conclusive that Sandy and Holmay had decided to consider various disciplinary responses to Leitgen's disruptive behavior well before she engaged in the allegedly protected conduct of talking to Tiggelaar. And Holmay's admission that no one had begun gathering documentation to support the recommendation for Leitgen's termination until September 2006 does not refute the undisputed evidence that Sandy and Holmay had already decided to pursue some type of discipline against Leitgen well before she ever met with Tiggelaar.

Leitgen next argues that the Hospital's sudden creation of a timeline of her "unacceptable behavior" just three days after her meeting with Tiggelaar is suspicious enough to overcome summary judgment. Although a retaliation claim can be supported by evidence of "sudden dissatisfaction with an employee's performance," particularly when an employee has a generally good record, *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005),

the evidence in this case belies that characterization. Leitgen refers us to her "outstanding" performance evaluation in March 2006, but in that evaluation, Sandy and Holmay told her that her interpersonal relationships had merely "improved." In any event, Sandy and Holmay did not suddenly become dissatisfied with Leitgen's behavior after she met with Tiggelaar; the evidence shows that they both considered her behavior to be problematic before the meeting, and they were already in the midst of devising methods to respond when she requested the meeting. The undisputed evidence also establishes that Holmay had been dissatisfied with Leitgen's interpersonal flaws for a long time, so much so that she participated in meetings with administrators three years earlier that had resulted in a recommendation that Leitgen be fired.

Leitgen also faults the Hospital for creating and relying on a timeline that was not based on pre-existing documents and for failing to comply with its policy recommending written warnings of unacceptable behavior. The Hospital's policy favors, but does not require, the written notice that Leitgen claims she never received. By Leitgen's own admission, she learned of many of the complaints against her when she was orally warned about her behavior. And she does not deny that she attended multiple meetings with Hospital administrators where they notified her of their problems with her attitude toward coworkers. Given that Leitgen admits that she attended disciplinary meetings and received oral warnings, the Hospital's neglect to follow its recommended policy of documenting those discussions is not evidence of retaliation.

Finally, Leitgen argues that the Hospital also retaliated against Keil, another female physician, by forcing her to quit after she complained that the pay system discriminated against her as a woman. This treatment, Leitgen urges, further supports her claim of retaliation. Although the Hospital's discrimination against other employees who raised similar complaints would be circumstantial evidence to support Leitgen's retaliation claim, *see Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 527 (7th Cir. 2008); *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994), Leitgen's reliance on Keil is unavailing because the record contains no evidence that the Hospital did in fact discriminate against Keil.

For the foregoing reasons, we therefore AFFIRM the judgment of the district court.