In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-2575

ALSHAFI TATE,

*Plaintiff-Appellee,*

*v.*

EXECUTIVE MANAGEMENT SERVICES, INC.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 05 C 47—**Theresa L. Springmann,** *Judge.*

ARGUED MAY 7, 2008—DECIDED OCTOBER 10, 2008

Before BAUER, POSNER, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Alshafi Tate, a former employee of Executive Management Services ("EMS"), claims that his supervisor, Dawn Burban, threatened to fire him if he refused to continue their sexual relationship. When Tate rejected her ultimatum, Burban instigated an altercation that led to his termination. Tate filed suit, alleging sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964. After a trial, the jury rejected Tate's sexual harassment claim, but found in his

favor on his retaliation claim. EMS appeals, arguing that Tate did not engage in protected conduct. EMS further maintains that Tate cannot prove that his termination was connected to his refusal to have sex with Burban because the decision to fire Tate was made pursuant to an independent investigation. Because Tate has not shown that he engaged in protected conduct, we reverse the district court's decision.

## I. BACKGROUND

EMS hired Alshafi Tate on August 19, 2002, to clean office buildings in Indianapolis, Indiana. His field supervisor was Dawn Burban, an EMS project manager for commercial cleaning. Burban picked Tate to be on her team, and within five to eight days after starting work for EMS, Tate says that he and Burban began having consensual sex two or three times per week, sometimes at work and other times at the home of a co-worker. Burban, however, denies that there was ever a sexual relationship. A week after Tate was hired, EMS promoted Tate to a supervisor based on Burban's recommendation and raised his pay from $7.00 per hour to $8.00 per hour.

Tate testified at trial that he and Burban engaged in consensual sex throughout his employment with EMS, with the exception of a period in 2003 in which he worked in a different building from Burban. Tate tried to end his sexual relationship with Burban in October 2003. He stated that he decided to end the relationship because after he got married in August 2003, Burban would repeatedly call his home, upsetting his wife. Tate also indicated

that he wanted to end the relationship because he "just wanted to keep the slate clean between me and my wife" and that Burban "was trying to make a hard choice for me." When Tate tried to end the relationship, Burban not only told him that she expected their sexual relationship to continue, she also informed him that if the relationship ended, he would lose his job. Tate testified that in December 2003, at a holiday dinner party with other co-workers, Burban again told him he had to continue having sex with her or he would lose his job. He maintains that he told Burban that he was not interested in continuing the relationship, and she responded that she would give him "a couple days to think about it." Tate testified that about two weeks after the holiday party, Burban inquired again whether Tate had "made a choice yet." It is not clear how he responded to this inquiry.

When Tate arrived for the start of his evening shift on January 13, 2004, at the City/County Building in Indianapolis, Burban summoned him into her office. Burban closed her office door and asked Tate if he had made his decision. Tate stated, "Yeah, I made a decision," and when he told her that he "wasn't messing with her anymore," there was a "big scene" in which Burban raised her voice and told Tate that he did not "know who [he was] f—king with" and that he "could leave right now." Tate further testified that he left Burban's office, but she followed him out into the break room, "hollering and getting irate" and saying "she's going to have my job" and "going to have my ass fired." Tate told Burban to call Darren Taylor, who was Burban's immediate supervisor and who was off-site at the time. Both Tate and Burban testified

that Burban called Taylor, but did not give Tate an opportunity to speak with Taylor. Taylor directed Burban to tell Tate to go home, and Tate was escorted off the premises by a court security officer named Dan Hudson. Hudson also testified at trial and indicated that he came upon an argument in progress between Burban and Tate and heard Burban tell Tate, "If you can't do what I tell you to do, just leave."

Tate testified that, prior to his departure, Burban did not direct him to perform any work-related assignment nor did he refuse to perform any work-related assignment. Burban, however, testified that Tate refused to go to his new assignment; that he did not provide a reason for this refusal; and that he became loud and belligerent after receiving his new assignment. After Tate left, Burban telephoned Nancy Scheumann, EMS's general manager for the Fort Wayne area at the time, and told Scheumann that Tate had refused to do his assigned work that evening so she sent him home. Burban then prepared an "insubordination" incident report stating that Tate had refused her request to help clean the Merrill Lynch building. In this report, Burban claimed that Tate said cleaning the Merrill Lynch building was "not his job"; that he only had to do certain tasks, which Burban determined would have taken only 5.5 hours to perform; and that Burban told him he was "here for 8 hours" and needed "to do 8 hours worth of work." The incident report further stated that Burban told Tate to go home after he continued to refuse the assignment, and that a security guard from the courthouse was present, heard what was going on, and watched Tate leave the building.

The next day, Tate attempted to telephone both Scheumann and Taylor to discuss the prior evening's events. When he contacted EMS's headquarters in Indianapolis, however, he reached Lorinda Lentz, a human resources official, who told Tate that he was terminated for insubordination and asked him to turn in his pager and uniforms. According to Lentz, the conversation lasted less than a minute. Tate testified that he asked if he could explain his side, but Lentz did not give him the opportunity.

Although Burban signed the termination report and Lentz communicated the decision to Tate, EMS maintains that the decision to terminate Tate's employment was made by Scheumann. Scheumann testified that she made the decision to terminate Tate by 8:50 a.m. on January 14, 2004, the morning following the altercation, after speaking to Burban, Taylor, and Hudson, and reviewing Tate's employment record. However, Hudson testified that he did not speak to Scheumann until "[s]ometime after the incident happened, maybe a month later or perhaps even sometime shorter than a month." Schuemann also did not speak to Tate about the incident and stated that "the fact that he refused to do what he was being asked to do by his supervisor" was considered insubordination, "and it wasn't a situation where it deemed [sic] an investigation of that incident."

The jury returned a verdict in Tate's favor on the retaliation claim and found against Tate on his sexual harassment claim. After trial, EMS renewed its motion under Federal Rule of Civil Procedure 50(b) for judgment as a

matter of law or in the alternative, a motion for a new trial, asserting: (1) Tate did not engage in any protected activity when he told his supervisor he would not continue to have sex with her to keep his job, and (2) EMS had no knowledge that Tate's supervisor had a retaliatory motive for her actions, and EMS discharged Tate based on the report of Hudson, who was a disinterested witness.

The district court denied EMS's post-trial motion. The court concluded that Tate had engaged in statutorily protected activity because "rebuffing sexual harassment can in some situations be considered opposition to an unlawful employment practice." The district court also concluded that the trial record would permit a reasonable jury to hold EMS liable, stating "there was sufficient evidence for the jury to find that Scheumann was Burban's rubber stamp and that Scheumann failed to conduct any independent investigation" of Tate's claims insulated from the discriminatory animus. EMS appeals.

## II. ANALYSIS

We review *de novo* the district court's denial of a motion for judgment as a matter of law under Rule 50(b). *Waite v. Bd. of Trs.*, 408 F.3d 339, 343 (7th Cir. 2005). "Once a jury has spoken, we are obliged to construe the facts in favor of the parties who prevailed under the verdict." *Tart v. Ill. Power Co.*, 366 F.3d 461, 464 (7th Cir. 2004) (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51 (2000)). We "examine all of the evidence in the record to determine whether the evidence presented was sufficient to support the jury's verdict," but in doing so, we

do not "make credibility determinations or weigh the evidence." *Waite*, 408 F.3d at 343 (citing *Reeves*, 530 U.S. at 150). In sum, we "will overturn a jury verdict for the plaintiff only if we conclude that no rational jury could have found for the plaintiff." *Id.*

Here, the jury concluded that Tate had proven facts sufficient to establish retaliation under Title VII and further, that the investigation conducted by EMS into Tate's termination was sufficiently tainted by Burban's discriminatory bias. EMS argues that Tate's retaliation claim never should have gone to the jury. Title VII provides that "it shall be an unlawful employment practice for an employer . . . to discriminate against any indi-vidual . . . because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. §2000e-3a. A plaintiff claiming retaliation under Title VII must show: "1) a statutorily protected activity; 2) an adverse action taken by the employer; and 3) a causal connection between the two." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007).

In order for Tate to have engaged in protected conduct, he does not have to prove that Burban sexually harassed him; therefore, the fact that the jury found against him on his sexual harassment claim, a finding he does not appeal here, is not dispositive. *See Fine v. Ryan Int'l Airlines,* 305 F.3d 746, 752 (7th Cir. 2002) ("a plaintiff need not prevail on her Title VII discrimination claim or have opposed an action that in fact violated Title VII to win a retaliation claim"). In order to engage in protected conduct, Tate only has to show that he "reasonably be-

lieved in good faith the practice [he] opposed violated Title VII.*" Id.*

As a threshold matter, there is a circuit split about whether a person who rejects a supervisor's sexual advances has engaged in a protected activity. *Compare LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 389 (5th Cir. 2007) (holding that a single, express rejection of sexual advances does not constitute "protected activity" for purposes of a retaliation claim) *with Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1007 (8th Cir. 2000) (finding that when the plaintiff told her supervisor to stop harassing her, she engaged in the most "basic form of protected conduct"). We have not addressed this issue. *See Murray v. Chi. Transit Auth.*, 252 F.3d 880, 890 (7th Cir. 2001) (declining to resolve the issue of whether a plaintiff who rejects a sexual invitation from a supervisor has engaged in protected conduct because the plaintiff did not show an adverse employment action). Even if we assume, for purposes of argument, that there may be circumstances in which a person who rejects his supervisor's sexual advances has engaged in a protected activity, Tate has not shown that he "reasonably believed in good faith the practice [he] opposed violated Title VII." *Fine,* 305 F.3d at 752.

There is simply no evidence in the record that Tate believed that Burban's actions were unlawful. In fact, the only statements that Tate made to Burban were that they "were not good with each other" and he "was not messing with her anymore," statements which do not indicate that Tate believed he was being sexually harassed. *Cf. Dey*

*v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1450 (7th Cir. 1994) (finding that the plaintiff had a good faith belief that she was opposing conduct that violated Title VII because after plaintiff found out that her supervisor's behavior would violate the law, she complained directly to management and to the supervisor, "indicating that his [inappropriate] comments and other conduct made her 'very uncomfortable,' that she intended to keep a log of his conduct, and that she hoped her objections would discourage any similar behavior in the future"); *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1315 (7th Cir. 1989) (finding that the "sincerity of [the plaintiff's] belief is amply supported by her assertion that she threatened to take her complaint about [her supervisor] to the EEOC and did in fact subsequently contact the EEOC"). Even when asked by his counsel what he would have said to management if given the opportunity after the altercation with Burban, Tate indicated that he would have told Scheumann and Taylor that he felt he was "wrongly mistreated," and that he was not being insubordinate. Moreover, Tate stated that he would have had Taylor confirm that Burban had previously called Tate's home and had an argument with Tate's wife, an altercation which Burban mentioned while in Taylor's presence. All of these statements point to personal reasons for ending the relationship rather than concerns about the legality of Burban's behavior.

We do not dispute that Tate protested about Burban's behavior; the problem is that he did not necessarily believe that her behavior was illegal at the time. *See Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 891 (7th Cir. 2004) ("The

purpose of requiring that plaintiffs reasonably believe in good faith that they have suffered discrimination is clear. Title VII was designed to protect the rights of employees *who in good faith protest the discrimination they believe they have suffered* and to ensure that such employees remain free from reprisals or retaliatory conduct.") (emphasis added). Indeed, Tate testified that he "wanted to leave Dawn" so that he could "start off with a clean slate" and "be true" to his wife. While there are no "magic words" that a plaintiff must use in order to indicate that the supervisor's behavior is unlawful, *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 687 (7th Cir. 2008), the record is devoid of any statements that indicate sexual harassment was at issue. Because Tate has failed to establish that he had a good faith belief that he was being sexually harassed, EMS is entitled to judgment as a matter of law.

## III. CONCLUSION

Accordingly, the judgment of the district court is REVERSED.