## In the
## United States Court of Appeals
### For the Seventh Circuit

No. 10-1418

JOSEPH P. O'LEARY,

*Plaintiff-Appellant*,

*v.*

ACCRETIVE HEALTH, INC.,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 C 1428—**Suzanne B. Conlon**, *Judge*.

ARGUED OCTOBER 19, 2010—DECIDED SEPTEMBER 21, 2011

Before CUDAHY and ROVNER, *Circuit Judges*, and
ADELMAN, *District Judge*.*

ROVNER, *Circuit Judge*.  After he was terminated from
his position as a senior vice-president for Accretive
Health, Inc. ("Accretive"), Joseph P. O'Leary sued the
company contending that he was fired in retaliation for

---

* The Honorable Lynn S. Adelman, of the Eastern District
of Wisconsin, sitting by designation.

opposing what he believed to be sexually and racially discriminatory conduct by one of Accretive's mid-level supervisors. Accretive contended that it fired O'Leary for inadequate work performance. The district court granted summary judgment to Accretive, concluding that O'Leary had not engaged in statutorily protected conduct by reporting two incidents of inappropriate behavior, and that in any event he had not established that Accretive's stated nondiscriminatory reasons for firing him were pretextual. *O'Leary v. Accretive Health, Inc.*, No. 09 C 1428, 2010 WL 234869 (N.D. Ill. Jan. 19, 2010). We affirm.

**I.**

Accretive is a Chicago-based consulting firm that provides billing, collections, and other revenue-cycle services to hospitals around the country. O'Leary joined Accretive as a vice-president in February 2005, when the company was less than two years old. O'Leary was assigned to oversee revenue-cycle operations at four Michigan hospitals. He initially reported to executive vice-president Etienne Deffarges, and then later directly to CEO Mary Tolan. When he joined Accretive, O'Leary had little or no experience with the revenue-cycle process.

O'Leary received a positive review at the end of 2005, but Accretive avers that as 2006 progressed, it developed certain reservations regarding his performance which accelerated in the closing months of the year. Tolan, to whom O'Leary was now reporting directly, was complimentary of O'Leary in many respects, but would later

testify that she was concerned about the revenue-cycle performance at certain of the hospitals under his supervision, as well as O'Leary's command of Accretive's operating model and pertinent data and his ability to implement improvements. To some extent, these issues were flagged in O'Leary's 2006 mid-year review as points that needed O'Leary's attention. O'Leary otherwise denies that any such criticisms were conveyed to him. Accretive also avers that beginning in mid-2006, it heard criticisms of O'Leary's performance from the chief financial officers at three of the hospitals for which he was responsible. Construing the record favorably to O'Leary, there is a dispute of fact as to whether two of these CFOs actually made the remarks that Accretive attributes to them. But what is undisputed is that in November 2006, Accretive replaced O'Leary with his predecessor at St. Mary's hospital in Saginaw, Michigan. Accretive represents that it made the change at the request of St. Mary's CFO, who had grown concerned about the growth of the hospital's accounts receivable and bad debt. O'Leary denies that St. Mary's requested his replacement, but as we discuss in detail below, he has presented no evidence calling into dispute Accretive's averment on this point. Deffarges would later testify that he and Tolan viewed their client's request to replace O'Leary as a "vote of no confidence in O'Leary's leadership on the ground." R. 44-2 at 29 (Deffarges Dep. 166).

Meanwhile, in October 2006, O'Leary had learned that Rhonda Miller, the site director at one of the hospitals under his supervision, had made sexually charged remarks during a dinner that the director had hosted for

four of her subordinates. Miller apparently had bragged about having sex with a number of Accretive employees as well as the CFO of her former employer. She had also told a young male employee at the dinner that she preferred dating men his age because "they were more her speed." R. 44-6 at 28 (O'Leary Dep. 134). That man, Blake Graves, later recounted the remarks to his supervisor, George Tsokolas, who in turn reported them to his own supervisor, O'Leary. Graves told Tsokolas that he did not feel that Miller had sexually harassed him; he would later say that he had mentioned Miller's remarks to Tsokolas as an amusing anecdote rather than as a complaint. When Tsokolas repeated the story to O'Leary, he told O'Leary that Graves did not feel harassed by Miller's conduct. (O'Leary disputes that Tsokolas told him this, but ineffectively; O'Leary's testimony at the cited pages of his deposition do not purport to deny this.) Indeed, Tsokolas did not believe that any additional action was required.

Although O'Leary by his own admission had no reason to believe that Graves felt sexually harassed by Miller's remarks, R. 54-1 at 17 (O'Leary Dep. 138), and O'Leary himself was agnostic on the question of whether Miller's remarks amounted to sexual harassment, R. 54-1 at 17, 18 (O'Leary Dep. 135, 138), he nonetheless thought it prudent to report the incident to senior management. On October 23, 2006, after first speaking with Deffarges, O'Leary informed CEO Tolan that Miller "had made comments in front of a staff person that she had had sexual relations with four other employees at Accretive Health" and that "she liked younger men." R. 44-10 at 21-

22 (Tolan Dep. 256-57). O'Leary wrote an email to Tolan and Deffarges later that same day memorializing his conversation with Tolan.

At Tolan's direction, Accretive's human resources director looked into the matter. His investigation concluded that although Miller "exercised very poor judgment in sharing intimate details about her personal life, especially with younger co-workers and direct reports[,] . . . [her] behavior is not in violation of any current Accretive Health policy or practice." R. 44-7 at 9 (O'Leary Dep. Ex. 11 at 2). Miller was nonetheless reprimanded and warned that another instance of inappropriate conduct could result in her termination.

When he reported Miller's conduct at the dinner to Tolan, O'Leary also mentioned that he believed Miller was "riding . . . really hard" a subordinate employee by the name of Seline Nichols, who is African American. R. 44-6 at 33 (O'Leary Dep. 142). Part of what prompted O'Leary to express this concern was the harsh manner in which Miller treated Nichols in one particular meeting in which O'Leary had participated. Nothing that Miller said during that meeting had racial overtones; and O'Leary knew that Miller had a reputation of being a "taskmaster" who "ruled with a bit of an iron fist" and himself considered her to be "a bit of a bully." R. 44-6 at 11, 16 (O'Leary Dep. 76, 106). But as we discuss below, O'Leary had other reasons to believe that Miller's adverse treatment of Nichols was based on Nichols' race, and O'Leary testified in his deposition that he expressed his concern to Tolan as one about racial dis-

crimination. O'Leary did not say anything in his follow-up email to Tolan about this concern. He would later characterize that omission as an oversight.

Shortly before the 2006 Christmas holiday, Tolan and Deffarges made the decision to terminate O'Leary. Deffarges would later testify that they believed that he had never developed a constructive relationship with the CFO at St. Mary's hospital, had failed to deal effectively with the revenue-cycle issues at St. Mary's which ultimately led the CFO at that hospital to request his replacement, had not demonstrated leadership at a second hospital, and had not improved on the already-strong results at a third hospital. Tolan added that O'Leary had never immersed himself in details of the revenue-cycle business and, as a manager, did not know who under his supervision was and was not performing up to snuff, and lacked the ability to coach his subordinates to achieve better results. O'Leary was informed of the termination decision after January 1, 2007.

Following his termination, O'Leary sued Accretive, contending that he was discharged in retaliation for opposing acts of sex and race discrimination at the company, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-3(a), and section one of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("section 1981"). He also asserted a claim under Illinois law for a bonus that he had allegedly earned but not received for 2006.

The district court granted summary judgment to Accretive on O'Leary's retaliation claims. 2010 WL 234869.

The court noted that in order to establish retaliation in violation of either Title VII or section 1981, O'Leary was first required to show that he engaged in activity protected by those statutes, i.e., that he had complained to Accretive of conduct that he reasonably and in good faith believed to be unlawful discrimination. *Id.* at *4 (citing *Tate v. Exec. Mgmt. Servs., Inc.*, 546 F.3d 528, 532-33 (7th Cir. 2008)). O'Leary's report of Miller's conduct at the October 2006 dinner did not qualify as protected activity, the court determined, because Miller's behavior on that one occasion, although unprofessional, constituted an isolated incident that no one could reasonably believe to be severe or hostile enough to constitute actionable sexual harassment. *Id.* Indeed, O'Leary knew that Graves, who was present at the dinner and had reported the incident to his supervisor, himself did not feel sexually harassed. *Id.* Although O'Leary contended that his report was not confined to the dinner, but also included his concern that Miller was treating Nichols in a racially discriminatory fashion, the court believed that O'Leary provided "no evidentiary support" for his assertion. *Id.* at *5. The record instead suggested that he had only commented on Miller's "harsh management style." *Id.*[1] The court also concluded, alternatively, that O'Leary had not presented sufficient evidence to estab-

---

[1] There were other incidents of alleged discriminatory conduct by Miller that O'Leary had brought to the attention of the court, but the court found insufficient evidence that O'Leary had reported them to Tolan or others at the company. *Id.*

lish a material dispute of fact as to whether Accretive discharged him because he had reported Miller's conduct. Although O'Leary was discharged less than two months after he made the report, the court observed that "[s]uspicious timing alone rarely satisfies the causation prong of a plaintiff's burden on summary judgment in a retaliation case." *Id.* (citing *Scaife v. Cook Cnty.*, 446 F.3d 735, 742 (7th Cir. 2006)). Furthermore, O'Leary's performance had received a negative review in June 2006, several months before he ever reported Miller's conduct. In addition, Accretive averred that it had received complaints from multiple clients about O'Leary, and although the fact and content of some of these complaints were disputed by O'Leary, it was uncontested that the CFO at St. Mary's hospital had requested O'Leary's replacement. In light of this evidence, the court found it undisputed that Accretive had discharged O'Leary for legitimate, nondiscriminatory reasons rather than because he had reported activity that he believed to be sexually or racially discriminatory. *Id.* at *5-6. The court went on to grant summary judgment in favor of O'Leary's claim of entitlement to a bonus, but the court's ruling as to that state-law claim is unchallenged in this appeal.

## II.

We review the district court's decision to resolve the case on summary judgment de novo. *E.g.*, *Gross v. PPG Indus., Inc.*, 636 F.3d 884, 888 (7th Cir. 2011). "Summary judgment is appropriate when there are no genuine

issues of material fact and judgment as a matter of law is warranted for the moving party." *Id.* (citing Fed. R. Civ. P. 56(a) and *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14 (1986)). In assessing whether the record entitled Accretive to judgment as a matter of law, we must examine the record in the light most favorable to O'Leary, against whom summary judgment was granted, *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 462 (7th Cir. 2010), resolving all evidentiary conflicts in his favor and according him the benefit of all reasonable inferences that may be drawn from the record, *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010). Only if no reasonable trier of fact could find in O'Leary's favor may we affirm the grant of summary judgment to Accretive. "It is not for courts at summary judgment to weigh evidence or determine the credibility of [a witness's] testimony; we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

O'Leary has asserted claims of retaliation under both Title VII and section 1981. Title VII, of course, prohibits both race and sex discrimination (among other forms) in the employment context, whereas section 1981 prohibits race discrimination in the making and enforcing of contracts. *See Kyles v. J.K. Guardian Security Servs., Inc.*, 222 F.3d 289, 302-03 (7th Cir. 2000). Both statutes also prohibit retaliation for opposing discriminatory practices that the statutes proscribe—Title VII expressly, § 2000e-3(a), and section 1981 by judicial interpretation, *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 128 S. Ct. 1951 (2008). "[U]nlawful retaliation occurs when an employer takes

an adverse employment action against an employee for opposing impermissible discrimination." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). Retaliation may be established by either the direct or indirect method of proof. The direct method requires the plaintiff to show: (1) that he engaged in activity protected by the statute; (2) that his employer took an adverse employment action against him; and (3) that there is a causal connection between the plaintiff's protected activity and the adverse employment action. *E.g.*, *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 673 (7th Cir. 2011). The causal nexus referenced by the third element may be shown through direct evidence, which would entail something akin to an admission by the employer ("I'm firing you because you had the nerve to accuse me of sex discrimination!"), *see Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004), or through "a 'convincing mosaic' of circumstantial evidence" that would permit the same inference without the employer's admission, *id.* (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)). The indirect method of proof employs the burden-shifting framework first articulated in the Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973). *E.g.*, *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 646-47 (7th Cir. 2005).

Regardless of which method the plaintiff employs to show retaliation, he must first demonstrate that he engaged in activity that is protected by the statute. Specifically, he must show that he took some step in opposition to a form of discrimination that the statute prohib-

its. The plaintiff need not show that the practice he opposed was in fact a violation of the statute; he may be mistaken in that regard and still claim the protection of the statute. *E.g.*, *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 441 (7th Cir. 2010) (citing *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 752 (7th Cir. 2002)). However, his opposition must be based on a good-faith and reasonable belief that he is opposing unlawful conduct. *E.g.*, *Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 747 (7th Cir. 2010), *cert. denied*, 131 S. Ct. 1603 (2011). If he does not honestly believe he is opposing a practice prohibited by the statute, *id.* at 747-48, or if his belief is objectively unreasonable, *Lang v. Nw. Univ.*, 472 F.3d 493, 495 (7th Cir. 2006), then his opposition is not protected by the statute.

Accretive contends that O'Leary's retaliation claims fail at this preliminary step. O'Leary's report and call for investigation of Miller's remarks at the dinner do not constitute protected conduct, in Accretive's view, because Miller's conduct on that single occasion could not reasonably be understood to constitute sexual harassment that would be actionable under Title VII. The company makes a similar argument vis-à-vis O'Leary's expression of concern that Miller might also be engaging in race discrimination. As Accretive reads the record, O'Leary only complained (to Tolan) that Miller was "riding" Nichols, based on one instance in which he had observed Miller berate her. In its view, a complaint that Miller was treating a subordinate harshly cannot reasonably be construed as a complaint of race discrimination simply because Miller is white and Nichols is African American, particularly given Miller's reputation

(known to O'Leary) as a taskmaster. Further, if O'Leary's complaint was based on what he observed on a single occasion, as Accretive asserts it was, then it could not reasonably be understood to be a protected complaint about racial harassment. And to the extent O'Leary avers that he complained about more than a single incident, the record, as Accretive understands it, does not support him. Our own review of the record leads us to conclude that Accretive is right as to O'Leary's complaint insofar as it concerned Miller's remarks at the dinner, but not insofar as it related to Miller's treatment of Nichols.

When O'Leary expressed concern to Tolan, Deffarge, and others about Miller's conduct at the dinner, he could not reasonably have believed that Miller's behavior constituted sexual harassment that was prohibited by Title VII. O'Leary knew that Miller had boasted of her sexual relationships with employees at Accretive and elsewhere and had remarked to the twenty-something Graves that men his age were more her speed. However, conduct must be either severe or pervasive to constitute actionable sexual harassment. *E.g.*, *Berry*, 618 F.3d at 691. Miller's conduct plainly was neither: it involved a single instance of sexually-charged remarks which, however imprudent they may have been, were relatively tame. The Supreme Court, in *Clark Cnty. Sch. Dist. v. Breeden*, found that a brief chortle among colleagues over a sexual remark made by a job applicant could not objectively be thought of as sexual harassment proscribed by Title VII, and for that reason the Court concluded that a complaint about the incident did not constitute protected opposition to discrimination. 532 U.S. 268, 271,

121 S. Ct. 1508, 1510 (2001) (per curiam). The same is true here. O'Leary had no reason to believe that Graves, who first mentioned the incident, felt harassed by Miller's comments; in fact, Tsokolas had told him that Graves did *not* feel harassed. Nor did O'Leary have reason to believe that anyone else in attendance at the dinner was bothered by Miller's remarks either. Even if Graves or someone else had expressed discomfort with the remarks, that would not be enough to establish that Miller's remarks by themselves established a hostile work environment, for conduct must be both objectively *and* subjectively offensive to be cognizable under Title VII. *E.g.*, *Berry*, 618 F.3d at 691. And although O'Leary points to some evidence in the record suggesting that Miller had engaged in similar behavior on other occasions, which would make for a stronger contention that she was running afoul of the statute, that evidence, to the extent it was known to him at the time he took the matter up the chain of command, neither triggered his complaint nor was discussed with his superiors. So far as the record reveals, O'Leary's report focused on one incident of inappropriate behavior by Miller. No one could reasonably think that Miller had violated Title VII through her conduct at the dinner alone. *See Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 889 (7th Cir. 2004) (finding plaintiff's sexual harassment charge not statutorily protected where based on one instance in which supervisor's breast brushed against his arm and another incident in which supervisor reached around plaintiff without touching him; no reasonable person could think that this conduct constituted sexual harassment, and

plaintiff himself did not believe that he had been sexually harassed). Consequently, O'Leary, even assuming that he was genuinely concerned about the possibility that Miller had engaged in harassment, did not engage in protected conduct when he reported the incident to his superiors. His retaliation claim, to the extent it is based on opposition to sex discrimination, therefore fails.

Whether O'Leary engaged in protected opposition to race discrimination when he mentioned to Tolan his concern that Miller was mistreating Nichols presents a closer question. Accretive suggests at the outset that O'Leary did not, in fact, say anything to Tolan about Miller's treatment of Nichols, given that Tolan did not recall him mentioning it and O'Leary himself said nothing about Nichols (or about race discrimination) in the follow-up email he sent to Tolan and Deffarges after he met with Tolan. The district court was of the same view, observing that O'Leary had provided "no evidentiary support" for the proposition that he had raised this concern with Tolan. 2010 WL 234869, at *5. But O'Leary testified unequivocally in his deposition that he did discuss Miller's treatment of Nichols with Tolan, R. 54-1 at 19 (O'Leary Dep. 141-44), and that is enough to establish a dispute of fact on this point. *Payne v. Pauley*, 337 F.3d 767, 771-73 (7th Cir. 2003). Accretive's contention that O'Leary did not identify his concern about Nichols as one of possible race discrimination also ignores his deposition testimony: O'Leary was specifically asked whether he expressly mentioned race discrimination to Tolan and he testified that he did. R. 54-1 at 19 (O'Leary Dep. 144); *see also id.* (O'Leary Dep. 142).

Where things get a bit murky is in ascertaining whether O'Leary was voicing a concern about race discrimination based solely on having observed Miller berate Nichols on one occasion. O'Leary's concern that Miller was "riding" Nichols evidently was based on that one incident, and that by itself would not support a reasonable basis to think that Miller was discriminating against Nichols based on race in a way that Title VII or section 1981 would recognize as actionable harassment. Moreover, Miller had not berated Nichols using racially charged language and her reputation as a tough boss would militate against any inference that the episode was attributable to any sort of animosity, race-based or otherwise, against Nichols.

But a fair reading of O'Leary's deposition suggests that the concern about race discrimination he voiced to Tolan was based on more than what he had seen on one occasion. O'Leary noted in his deposition that he had not seen Miller treat white employees in the same manner he had seen her treat Nichols; that Miller had complained to him about Nichols and two other black employees; and that he had never heard anything negative about the performance of these three employees until Miller became their supervisor. Nichols ultimately resigned from the company, and O'Leary testified that based on his subsequent conversations with Nichols, he believed that Miller had forced her out. (Nichols told O'Leary that she had grown so frustrated with Miller's overbearing behavior that she asked Miller, "[W]hat do you want me to do, quit?" To which Miller had responded, "I accept your resignation." R. 54-1 at 10 (O'Leary

Dep. 90-91). Nichols also mentioned to O'Leary that a friend had encouraged her to file a charge of discrimination with the Equal Employment Opportunity Commission, and that she was contemplating that possibility. As we read the record, O'Leary testified that he had all of this in mind when he told Tolan that he was concerned that Miller was guilty of race discrimination in her dealings with Nichols.[2]

---

[2] After having laid out the various ways in which he believed that Miller had mistreated her subordinates at Accretive, including the circumstances that caused him concern that Miller may have discriminated against Nichols on the basis of her race, O'Leary was asked at his deposition whether, "other than the conduct of Ms. Miller that [he had] described," he had ever reported any other complaints about Miller's conduct to Tolan or other senior Accretive officials. O'Leary answered, "None other than what we've discussed." Accretive Br. 26 (quoting O'Leary Dep. 158). Accretive reads O'Leary's answer as a concession that, insofar as he expressed a concern to his superiors about the mistreatment of Nichols, his concern was based solely on the one meeting at which O'Leary had observed Miller berating Nichols and was framed as such. Unfortunately, we cannot locate the relevant page from O'Leary's deposition in the record: rather than submitting the entire deposition, the parties have included only excerpts that do not include this particular page. So we lack the immediate context surrounding the question and answer that would permit an independent assessment of what O'Leary meant. Even so, it seems to us that when O'Leary said "none other than what we've discussed," it is possible and even likely that he was referring to *all* of the circumstances that led

(continued...)

Now, it appears to be true, as Accretive points out, that O'Leary had the chronology wrong when he testified that Nichols had resigned by the time he spoke with Tolan: O'Leary's meeting with Tolan was on October 23, 2006, and the record indicates that Nichols did not resign until October 25. But although Nichols had not yet resigned when O'Leary spoke with Tolan, it is nonetheless a fair reading of his deposition testimony that the concern he expressed about race discrimination was based on more than the one occasion on which he had seen Miller berate Nichols. It is also a fair inference that O'Leary's concern was not simply that Miller might be making the workplace hostile for Nichols, but also that she might be evaluating Nichols' job performance negatively based on her race rather than her competence, which is the type of discrimination that commonly results in a tangible, adverse employment action against an employee. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 760-65, 118 S. Ct. 2257, 2268-70 (1998) (distinguishing between harassment and tangible employment actions for purposes of employer liability).

---

[2] (...continued)

him to suspect Miller of engaging in race discrimination—and which he had discussed earlier in his deposition—not just the single instance in which he saw Miller treat Nichols harshly. Moreover, O'Leary had already testified by this point that he did describe the concern he expressed to Tolan as one about race discrimination rather than generic mistreatment of Nichols. R. 54-1 at 19 (O'Leary Dep. 144). We owe O'Leary the benefit of the doubt on this point.

Moreover, Tolan was not the only person with whom O'Leary said he raised this concern. From his amended complaint forward, O'Leary alleged that he voiced this concern to Tolan "and others at Accretive." R. 37 ¶ 30 (amended complaint); *see also* R. 65 ¶¶ 57, 64, 109 (corrected response to defendant's statement of facts); R. 54-1 at 13 (O'Leary Dep. 101-02), 14 (O'Leary Dep. 107-08). For example, O'Leary testified at his deposition that after he learned that Nichols had resigned and was considering the possibility of a discrimination charge, he discussed his concerns with Stanley Telford, the company's director of human resources. R. 54-1 at 13 (O'Leary Dep. 102-03). According to O'Leary, Telford in turn followed up with him after conducting Nichols' exit interview, informing O'Leary that because Nichols had not volunteered any observation that she had been discriminated against by Accretive, he did not think there was anything to worry about. R. 54-1 at 13-14 (O'Leary Dep. 102-05). O'Leary avers that he also reported his concerns regarding Miller's treatment of Nichols to Deffarges, Stephen Smith (another senior vice-president) and Greg Kazarian (Accretive's general counsel), among others. R. 65 ¶¶ 57, 64, 109; R. 54-1 at 13-14 (O'Leary Dep. 101-08), 18 (O'Leary Dep. 138). Deffarges and Telford have denied that O'Leary reported any concerns about Miller mistreating Nichols. R. 44-2 at 37-38 (Deffarges Dep. 242-43); R. 44-8 at 10 (Telford Dep. 303). But Kazarian recalled O'Leary having a concern that Miller was too demanding of her subordinates, including Nichols, R. 59-1 at 11 (Kazarian Dep. 214-15), and Smith acknowledged that O'Leary expressed a concern that Miller had driven

Nichols out of the company and might pursue some sort of claim against Accretive, R. 57-1 at 23-24 (Smith Dep. at 157-58). In any case, the record, construed favorably to O'Leary, certainly supports the notion that he did voice a concern within the company that Miller was mistreating Nichols, and that he expressly labeled his concern as one about race discrimination in his discussion with CEO Tolan.

Assuming the truth of O'Leary's version of events, his complaints about Miller's treatment of Nichols constituted a cognizable expression of opposition to the sort of discriminatory practices that are prohibited by Title VII and section 1981. Based on the circumstances he described in his deposition, his belief that Miller might be taking adverse employment actions against Nichols on the basis of her race was a reasonable, good-faith concern about race discrimination and was therefore protected by both statutes. We must therefore consider whether O'Leary has otherwise provided sufficient evidence in support of his claim of retaliation.

O'Leary has attempted to establish retaliation through both the direct and indirect methods of proof. As to the former, we conclude that the evidence does not support a finding of a causal connection between his complaint and his subsequent discharge. As to the latter, we do not believe he has presented sufficient evidence that Accretive's stated reasons for his discharge are pretextual.

Our discussion of direct proof of retaliation may be brief. O'Leary relies principally on the fact that Accretive decided to fire him within sixty days after he voiced

concerns about Miller to demonstrate a causal nexus between those two events. But, as the district court recognized, temporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter. *E.g.*, *Leitgen*, 630 F.3d at 675. The timing of events in this case is not strongly suggestive of retaliation, either alone or in the context of other circumstances O'Leary has cited.

The indirect method of proof requires the plaintiff to first establish a prima facie case of discrimination (in this case, retaliation) by establishing (in addition to statutorily-protected conduct and an adverse employment action) that he was performing his job satisfactorily and that he was treated less favorably than one or more other similarly situated employees who did not oppose discrimination. *E.g.*, *Whittaker*, 424 F.3d at 647. If he succeeds in making a prima facie showing, then Accretive must offer a legitimate, nondiscriminatory explanation for the decision to discharge him. *Id.* The burden of production then returns to O'Leary to show that Accretive's articulated reason for his discharge is pretextual. *E.g.*, *Vance v. Ball State Univ.*, 646 F.3d 461, 473 (7th Cir. 2011). The parties are at odds over virtually every element save for whether O'Leary suffered an adverse employment action (he was discharged). We believe that O'Leary's case falters on his attempts to show that he was meeting his employer's expectations and that Accretive's stated reasons for discharging him are pretextual, which because they both relate to his work performance, amount to two sides of the same

coin. *See Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006).

In order to show that the employer's stated, nondiscriminatory reason for firing him is pretextual, the plaintiff must present evidence suggesting that the employer is dissembling. Where, as here, the employer contends that the plaintiff's job performance was wanting, the plaintiff must do more than dispute the validity of the employer's criticisms. The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge. *E.g.*, *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 397 (7th Cir. 2010). "[I]t is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 601 (7th Cir. 2010) (quoting *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005)).

O'Leary's best evidence of pretext is found in declarations from officials of two of the hospitals under O'Leary's supervision—Borgess Medical Center in Kalamazoo and Genesys Regional Medical Center in Flint—whom Accretive said were critical of O'Leary's performance, denying that they had said anything negative about O'Leary. R. 53-4 ¶ 6 (Decl. of Richard Felbinger); R. 53-7 ¶ 6 (Decl. of John Keuten). These declarations do not address the particular remarks that Accretive has attributed to them; but because the declarants categorically

deny having said *anything* critical about O'Leary, it is a fair inference that their denial includes the remarks to which Accretive refers, which were negative. So construed, these declarations would support an inference that the remarks were not, in fact, made, and that Accretive did not honestly believe that the clients themselves were dissatisfied with the company's performance generally or with O'Leary's performance in particular.

Notably, however, O'Leary has no such evidence with respect to the criticism Accretive says it received from the CFO of St. Mary's hospital, Gary Chawk. Recall that, according to Accretive, Chawk had begun expressing concern in the summer of 2006 about the growth of accounts receivable and bad debt at St. Mary's and ultimately, in November 2006, asked that Smith (O'Leary's predecessor on the account) be brought in to replace O'Leary. It is undisputed that O'Leary was, in fact, replaced on the St. Mary's account; and although O'Leary denies that Chawk asked for removal, he has no testimony from Chawk disputing that it was Chawk who solicited his replacement on the account (more on that in a moment). O'Leary questions the veracity of Tolan and Deffarges in attributing this request to Chawk, but however self-serving and uncorroborated their testimony may be, it is perfectly good evidence that Chawk made the request. *Payne v. Pauley*, *supra*, 337 F.3d at 771-73. The most that O'Leary can counter with is Tolan's previous notation, in his June 2006 review, that Chawk was a "strong vocal supporter" of O'Leary's. R. 44-7 at 18 (O'Leary Dep. Ex. 31 at 2). That certainly supports the notion that Chawk was content with O'Leary's helmsmanship of the revenue

cycle at St. Mary's at that time, but it by no means rules out the possibility that Chawk might have requested his ouster five months later.

It is true that O'Leary was denied leave to depose Chawk. But O'Leary did not seek to take Chawk's deposition until he had already taken the ten depositions allotted to him by Federal Rule of Civil Procedure 30, plus an additional three that were taken by the parties' agreement. He filed a motion to depose up to twenty individuals (which Accretive opposed), R. 29, followed by a more modest request to depose five more people, Chawk among them, R. 34. But as the district judge noted in her order denying the narrower motion, O'Leary did not adequately explain why, given what O'Leary had learned from the individuals already deposed and what he anticipated discovering from the proposed deponents, leave to take any of these additional depositions was warranted. R. 36 at 2. Discovery orders of this nature are reviewed for abuse of discretion. *E.g.*, *Walker v. Sheahan*, 526 F.3d 973, 977-78 (7th Cir. 2008). O'Leary has not demonstrated that the court abused its discretion in denying his unsubstantiated request.

Deffarges indicated in his testimony that O'Leary's ouster from the St. Mary's account at the request of the client was a tipping point in Accretive's decision to discharge O'Leary. "I felt the Gary Chawk request might be the straw that broke the camel's back, to use a colloquial expression," he said. R. 44-2 at 30 (Deffarges Dep. 169). Relatedly, Deffarges and Tolan both cited poor handling of accounts receivable and the growth in

uncollectible debt at St. Mary's as a reason for their dis-
satisfaction (as well as Chawk's discontent) with
O'Leary's performance. R. 44-10 at 18-19 (Tolan Dep. 224-
25); R. 44-2 at 29 (Deffarges Dep. 166); *see also* R. 44-4
(Kazarian Dep. 73-74). O'Leary disagrees with the notion
that there was a significant problem with accounts re-
ceivable or bad debt at St. Mary's and suggests that to
the extent that Chawk became dissatisfied with Accre-
tive's performance, his discontent was due to another
issue for which O'Leary had little or no responsibility.
But he has cited no record evidence which might
permit the factfinder to conclude that Tolan and
Deffarges did not honestly believe there was a sig-
nificant problem with accounts receivable and bad debt
and that the problem was due to a failure of leader-
ship on O'Leary's part. O'Leary's failure to call into
question the notion that Accretive perceived there to be
an accounts-receivable crisis at St. Mary's, or that Chawk
solicited his replacement on the account, leaves a key
reason cited for his discharge unchallenged.

We hasten to add, however, that the record reflects
additional concerns that stand unrebutted on the current
record. As we noted in our summary of the facts,
O'Leary's 2006 mid-year review, which was conducted
by Tolan, while positive in a number of respects, was not
unqualifiedly so. Tolan rated him "2" vis-à-vis Accretive's
operational model, indicating that his command and
application of the model was "marginal" and required
improvement. R. 44-7 at 17-18 (O'Leary Dep. Ex. 31 at 1-2).
By way of explanation, Tolan wrote that "Joe needs to go
deeper into key elements of the operating model so that

he can action and model and teach." *Id.* at 18 (O'Leary Dep. Ex. 31 at 2.) Tolan would later describe this rating as "a very damning assessment." R. 44-9 at 21 (Tolan Dep. 45). In the same review, Tolan, speaking to the composite performance of the Greater Michigan hospitals under O'Leary's supervision, observed:

> Goals are obtainable [sic], however, Joe will need to mount intense focused attention to drive the results home. Joe will need to be very hands on, close to the details and driving key initiatives while teaching the team to better understand the levers that get results. Key focus must produce better execution . . . ."

R. 44-7 at 17 (O'Leary Dep. Ex. 31 at 1).

Tolan's subsequent deposition testimony articulating the reasons for the decision to discharge O'Leary tracked and expanded on the areas of improvement she had noted in his mid-year review. Tolan testified that O'Leary had failed to immerse himself in the details of the revenue-cycle business and acquire a complete understanding of that business. She also believed that his subordinates lagged in their performance, that he was not conversant with who under his command was a good performer and who was not, and that he failed as a leader in helping the laggards to improve their performance and in moving issues forward toward resolution. R. 44-9 at 18-21, 25-26, 28 (Tolan Dep. 42-45, 82-83, 92); R. 44-10 at 4 (Tolan Dep. 130).

We note further that although O'Leary has established a dispute of fact as to whether the CFOs of Borgess and Genesys expressed criticisms of his work, he has not

otherwise called into question the concerns that Tolan and Deffarges had with respect to his performance at those two hospitals. In his deposition testimony, Deffarges recalled that Tolan told him the Borgess team could do better and that O'Leary was not sufficiently engaged to lead the team to a higher level of performance. R. 44-2 at 14-15 (Deffarges Dep. 89-90). This is consistent with the observation that Tolan had made in her mid-year review of O'Leary: "Borgess—Revenue results have been plateauing and at times the team seems to be unclear about their plan of action to get to 4% net revenue improvement pace." R. 44-7 at 17 (O'Leary Dep. Ex. 31 at 1). With respect to Genesys, Deffarges recounted Tolan's observation that the Accretive team was "rudderless." R. 44-2 at 15 (Deffarges Dep. 90). This is consistent with the types of concerns Tolan had noted in the mid-year review: "This team generally lacks command of the pertinent information and is often very slow in adopting Accretive [o]perating model approaches. Cost control also looks rocky here." R. 44-7 at 17 (O'Leary Dep. Ex. 31 at 1).

  As we noted at the outset, there is a dispute of fact as to whether Tolan, apart from the observations she made in the written 2006 mid-year review, communicated any of these criticisms to O'Leary, although he has acknowledged being advised of the areas in which he could improve his performance via the performance reviews. See R. 71 at 19 (O'Leary Dep. 160). Tolan testified that she repeatedly did convey her concerns to O'Leary, both before and after the mid-year review.

But O'Leary denied this in his own deposition testimony and declaration, and his own testimony is enough to create a dispute of fact on this point.

Tolan testified that she also made her concerns known to other Accretive executives, and in this respect there is not a dispute of fact. Tolan testified that she communicated her criticisms of O'Leary to Deffarges, John Staton (Accretive's CFO), and Kazarian during the second half of 2006. R. 44-9 at 12-13, 27-28 (Tolan Dep. 31-32, 91-92). Deffarges, for one, confirmed that Tolan had discussed such concerns with him. R. 44-2 at 14-15 (Deffarges Dep. 89-90). O'Leary generally denies the truth of Tolan's testimony on this point, but none of the evidence he cites (principally his own declaration denying that such criticisms were ever communicated to *him*, *see* R. 53-10 ¶¶ 16-18) actually calls into question whether Tolan in fact did voice concerns about O'Leary's performance to her colleagues.

And although O'Leary has denied that such criticisms were expressed to him, we note that his own communications with other Accretive employees reflects an awareness that Tolan was not content with his performance. At some point in the spring or summer of 2006, for example, O'Leary complained to Deffarges that Tolan had "unreasonable expectations" and "was never happy about the results." R. 44-2 at 13 (Deffarges Dep. 88). (O'Leary attempts to dispute this averment, R. 65 ¶ 21, but ineffectively; none of the evidence he cites purports to deny that he said this.) And in late September 2006, before he ever raised his concerns about

Miller, he wondered in an email whether Tolan did not want to fire him. R. 44-7 at 28 (O'Leary Dep. Ex. 38).

None of the evidence calls into question the veracity of the legitimate, performance-related concerns that Accretive has articulated for O'Leary's discharge. O'Leary vigorously disputes the merits of these criticisms. But it is not for us to decide whether Tolan was right or wrong in finding his performance wanting. We do not sit as a super-personnel department. *See*, *e.g.*, *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 738 (7th Cir. 2011). The only question is whether these were actually the reasons for O'Leary's discharge. And O'Leary has presented no evidence from which the factfinder could conclude that Tolan and Deffarges did not honestly believe these criticisms and discharged him based on these nondiscriminatory grounds.

### III.

We AFFIRM the district court's decision to enter summary judgment against O'Leary and in favor of Accretive.