In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-1410

NOEMI VALDIVIA,

*Plaintiff-Appellee,*

*v.*

TOWNSHIP HIGH SCHOOL DISTRICT 214,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 16 C 10333 — **Sidney I. Schenkier**, *Magistrate Judge.*

ARGUED SEPTEMBER 4, 2019 — DECIDED NOVEMBER 12, 2019

Before WOOD, *Chief Judge*, and BAUER and HAMILTON, *Circuit Judges.*

WOOD, *Chief Judge*. Noemi Valdivia worked successfully as an administrative assistant for Township High School District 214, which is headquartered in Arlington Heights, Illinois, until she began experiencing severe psychological problems that ultimately led to the end of her employment there. She sued the District under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–2654, claiming that it interfered

with her rights under the Act by failing to provide her with notice or information about her right to take job-protected leave. After a trial over which a magistrate judge presided by consent, see 28 U.S.C. § 636(c), a jury returned a verdict in Valdivia's favor and awarded her $12,000 in damages. The District then moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(b). The district court denied that motion, and the District has now appealed. It takes a lot to set aside a jury verdict, and we conclude that the District has not met that high bar. We thus affirm the judgment.

**I**

The only issue on appeal is whether the court erred by denying the District's Rule 50(b) motion. This is a question of law, and thus our consideration is *de novo*. *Tate v. Exec. Mgmt. Servs., Inc.*, 546 F.3d 528, 531 (7th Cir. 2008). We view the facts and evidence in the light most favorable to Valdivia, as the litigant who prevailed before the jury. *Id.* at 531–32.

From May 2010 through June 2016, Valdivia worked for the District as an assistant to the associate principal for instruction at Elk Grove High School. During her time at Elk Grove, Valdivia received excellent performance evaluations. Her supervisors described her as "extremely dependable" and an "invaluable resource," and they said that her work was "immaculate" and "free from error." Valdivia was never disciplined and rarely took sick days.

After learning about a new opening within the District, Valdivia applied for and received a promotion to the post of assistant to the principal at Wheeling High School. She began reporting to Wheeling's principal, Angela Sisi, in mid-June 2016. Valdivia and Sisi had not worked together previously,

but they had been acquainted for several years. Valdivia had worked as an assistant to Sisi's mother at Elk Grove for eight or nine months, and Sisi's mother told Sisi that Valdivia was the "best assistant [she] ever had."

Unfortunately, shortly after she started at Wheeling, Valdivia's mental state began to deteriorate. She had trouble sleeping, eating, and getting out of bed, and she lacked energy. In July her symptoms worsened: she experienced insomnia, weight loss, uncontrollable crying, racing thoughts, an inability to concentrate, and exhaustion. Valdivia began going into work late because she could not drag herself out of bed, and she started leaving work early because she could not control her crying. She applied for other jobs, thinking a different position might help her.

Valdivia did not attempt to conceal these symptoms. To the contrary, she met with Sisi and told Sisi that she was feeling overwhelmed, had lost weight, was not able to sleep, and was not hungry. She also mentioned that she had received an offer for a different job but said that she would probably remain at Wheeling. During this conversation, Sisi tried giving Valdivia a work assignment, but Valdivia pleaded, "[N]o, don't do this to me right now."

About two days after that initial conversation, Valdivia spoke to Sisi again. Once again, she described in detail what was happening to her: "I'm so confused. I'm not eating[.] I'm not sleeping. I've been losing weight. I'm [] so overwhelmed. I don't understand what's happening to me." Valdivia also asked Sisi to give her a ten-month position, instead of her twelve-month job, because she thought that time away from the workplace might help. Sisi declined the request, prompting Valdivia to say that she might accept the other job offer.

Shortly thereafter, Valdivia had a third conversation with Sisi. Sisi told Valdivia that she needed to decide whether she was staying or leaving. Valdivia started crying, and the encounter ended inconclusively. Valdivia sought out Sisi four or five more times after that conversation to discuss whether she should accept the other job offer. A few times, Valdivia went home early after one of those conversations, again because of uncontrollable crying. At one point in early August, Valdivia told Sisi that she was considering leaving "for medical reasons," and she again asked for a ten-month job.

Feeling pressure from Sisi to decide whether she was staying at Wheeling or leaving, Valdivia submitted a letter of resignation on Thursday, August 4, 2016; the letter indicated that it would take effect a week later, on August 11, 2016. Almost immediately, Valdivia regretted her decision to resign. On August 9, 2016, she showed up at Sisi's home early in the morning, crying and asking to rescind her resignation. Sisi, frustrated that Valdivia had woken her children, sent Valdivia to work and denied Valdivia's request to rescind.

Valdivia's employment with the District therefore ended on August 11, 2016. That same day, Valdivia scheduled an appointment with her primary care physician, Dr. Lisa Glosson. Dr. Glosson's records note that Valdivia had been suffering from depression, difficulty falling asleep, difficulty concentrating, loss of appetite, anxiety, and restlessness for several weeks. Dr. Glosson prescribed Xanax for her. The next day, Valdivia began her new job, but she was able to work for only four days before quitting.

On August 21, 2016, Valdivia went to St. Joseph Hospital's emergency room and informed the doctor that her anxiety and sleeplessness had persisted for a month. She returned to

the hospital on August 23, 2016. That time, she was admitted for four days and given medication for anxiety and severe major depressive disorder. On August 31, 2016, Valdivia visited a psychiatrist, Dr. Syed Waliuddin. Based on Valdivia's reported symptoms, he too diagnosed her with major depressive disorder, single episode, severe, and generalized anxiety disorder. Dr. Waliuddin testified that it would be "difficult for anybody to work" with her symptoms.

## II

Congress enacted the FMLA to assist employees in balancing the demands of their jobs with their own medical needs and those of their families. *Harrell v. U.S. Postal Serv.*, 445 F.3d 913, 918–19 (7th Cir. 2006). The Act's purpose is to "entitle employees to take reasonable leave for medical reasons … in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b)(2)–(3). To accomplish this goal, the FMLA provides that an eligible employee may take up to twelve (unpaid) workweeks of leave during a twelve-month period if she is unable to perform the functions of her position because of a serious health condition. *Id.* § 2612(a)(1). An employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" the rights guaranteed by the statute. *Id.* § 2615(a)(1).

To prevail on an FMLA-interference claim, an employee must establish the following: (1) she was eligible for the FMLA's protections, (2) her employer was covered by the FMLA, (3) she was entitled to leave under the FMLA, (4) she provided sufficient notice of her intent to take leave, and (5) her employer denied her FMLA benefits to which she was entitled. *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006). The District argues that the district court erred in denying its

motion for judgment as a matter of law because, in its view, no reasonable juror could find that (a) Valdivia was entitled to leave under the FMLA or (b) Valdivia provided the District with adequate notice. We address its arguments in that order.

A

An employee is entitled to FMLA leave if (1) she is afflicted with a "serious health condition," and (2) that condition makes her unable to perform the essential functions of her position. *Guzman v. Brown Cnty.*, 884 F.3d 633, 638 (7th Cir. 2018). An employee has a "serious health condition" within the meaning of the FMLA when she has "an illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

The evidence in this record was sufficient to support the jury's finding that Valdivia had a serious health condition. Shortly after she left her job with the District, while she was experiencing symptoms identical to those she had described to Sisi, Valdivia was hospitalized for four days. Extrapolating from that hospitalization, the jury could conclude that while Valdivia was employed by the District, she had a "mental condition" that involved "inpatient care in a hospital." In addition, at trial Valdivia provided detailed testimony describing her condition and the symptoms she experienced from June through August 2016, including insomnia, loss of appetite, weight loss, and uncontrollable crying. Her medical records, which corroborated this testimony, were admitted into evidence. Those records stated that Valdivia suffered from anxiety or depression, or both. Valdivia's psychiatrist, Dr. Waliuddin, also testified at trial. He diagnosed Valdivia with

severe major depressive disorder and generalized anxiety disorder, which he explained meant that Valdivia had exhibited symptoms for at least two weeks. Based on these evidentiary sources, the jury reasonably found that Valdivia suffered from a serious health condition.

Moreover, a reasonable jury could also conclude, as this jury did, that because of her serious health condition, Valdivia was unable to perform the functions of her job. Valdivia testified that she often arrived late to work or left work early, had difficulty concentrating, and struggled to complete tasks. Dr. Waliuddin testified that Valdivia's symptoms would make it "difficult for anybody to work."

Although Valdivia's doctors did not examine her while she was working at the District, we have found that an employee does not need to be *diagnosed* during her employment, as long as the condition existed then. For example, in *Burnett*, we found that an employee could show that he was entitled to leave under the FMLA even though he was not diagnosed with prostate cancer until after he was fired. 472 F.3d at 480–81. In addition, in *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832 (7th Cir. 2014), we held that expert medical testimony was not required to prove, on a day-by-day basis, that an employee was incapacitated every day for which he requested FMLA leave. Instead, for a chronic condition such as depression, lay testimony, supplemented by medical records, was sufficient. *Id.* at 839. Here, Valdivia's testimony indicated that she had exhibited symptoms for weeks, including at least some time when she was working at Wheeling, and her medical records supported the fact that her condition did not arise for the first time on the day she saw the doctor.

Viewing the testimony and medical records in the light most favorable to Valdivia, we see no reason to disturb the jury's conclusion that Valdivia had a serious health condition that made her unable to perform the functions of her job while she was working for the District.

B

The District also contends that the notice Valdivia provided was insufficient as a matter of law. The FMLA notice requirements "are not onerous." *Burnett*, 472 F.3d at 478. Direct notice from an employee to an employer is not always required; an employer's constructive notice of an employee's need for FMLA leave may be sufficient. *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381–82 (7th Cir. 2003). We acknowledge that the language of the pertinent regulation has changed since *Byrne* was decided: as of 2003, the regulation said that "[i]t is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, *except in extraordinary circumstances* where such notice is not feasible," while the 2009 version calls for notice as soon as practicable and says that "*generally*" it should be practicable within the time prescribed by the employer. Compare 29 C.F.R. § 825.303(a) (2003) (emphasis added) with *id.* (2009) (emphasis added). This change prompted the Eighth Circuit to wonder whether constructive notice will still suffice in these cases. See *Scobey v. Nucor Steel–Arkansas*, 580 F.3d 781, 788 (8th Cir. 2009). But 29 C.F.R. § 825.303(a), in both of its forms, addresses only the timing of notice, not whether it must be oral, in writing, direct, or inferable from the circumstances. And in any event, in our case the District waived any argument based on the 2009 amendments when it failed to raise this point before the district court in its

Rule 50(b) motion. See *Wheeler v. Hronopoulos*, 891 F.3d 1072, 1073 (7th Cir. 2018).

*Byrne* was a case in which we held that clear abnormalities in an employee's behavior may be enough to alert the employer to a serious health condition. 328 F.3d at 381–82. In such cases, "observable changes in an employee's condition … present an obvious need for medical leave, thereby obviating the need for an express request for medical leave." *Burnett*, 472 F.3d at 479. It is enough for purposes of the FMLA, we said, that an employer "knows of the employee's need for leave; the employee need not mention the statute or demand its benefits." *Stevenson v. Hyre Elec. Co.*, 505 F.3d 720, 726 (7th Cir. 2007) (quoting *Byrne*, 328 F.3d at 382). There, the employee's unusual behavior of sleeping on the job, particularly when he had been a model employee throughout his four-year history with the employer, constituted constructive notice. 328 F.3d at 381–82. The employee's sister had also told his employer that he was "very sick," and the employee mumbled odd phrases when a supervisor finally asked him about sleeping on the job. *Id.* at 380.

The record before the jury in Valdivia's case included more than these danger-signs from the employee's behavior. Valdivia met with Sisi on several occasions to report her deteriorating mental health. She asked for the accommodation of a ten-month position rather than a twelve-month position, even though she did not expressly mention the FMLA when she made the request. She said that she was incapable of accepting a new work assignment. These conversations take her case out of the pure constructive-notice model. The jury was entitled to conclude that this was timely and actual notice to the employer.

Valdivia's behavior also came directly to Sisi's attention. The District was not held responsible for problems that it might have, but did not, deduce from a course of conduct; through Sisi, it had actual knowledge about the situation. Valdivia had been a model employee during her six years at Elk Grove. Her behavior at Wheeling contrasted sharply with what Sisi expected from her record. Sisi's mother had told Sisi that Valdivia was "the best assistant [she] ever had." Shortly after she moved to Wheeling, however, Valdivia began experiencing problems. The jury was entitled to conclude that Sisi knew about those problems: the profuse crying, the late arrivals and early departures, and the inability to finish tasks. Valdivia, after all, was Sisi's personal assistant. The District thus had notice of Valdivia's problem through her conduct, as well as through her direct reports.

Adequacy of notice is a "fact-rich question" that is "perhaps best resolved by the trier of fact, particularly, where, as is the case here, the employer and employee dispute the quantity and nature of communications regarding the employee's illness." *Burnett*, 472 F.3d at 479 n.4. This record presented a jury question on notice, not a matter suitable for resolution as a matter of law. The jury concluded that Valdivia's notice to the District was adequate, and that decision must stand.

We therefore AFFIRM the judgment of the district court.